**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| ANTHONY WHITAKER and | ) | |
| JACQUELINE WILLIAMS, as Surviving | ) | |
| Parents of Marquis A. Whitaker, Deceased, | ) | |
| and ANTHONY WHITAKER, as | ) | |
| Administrator of the Estate of Marquis | ) | CIVIL ACTION FILE |
| A. Whitaker, | ) | NO.: 4:05CV78 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KELLOGG BROWN & ROOT, INC., | ) | |
| ESTATE OF QUAISAR KAHN, and | ) | |
| HUSSAIN KIZHIKKINAM, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT KELLOGG BROWN & ROOT, INC.'S MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(B)**

Defendant Kellogg Brown & Root, Inc. ("KBR"), through undersigned counsel, hereby

files this memorandum in support of its motion pursuant to Rule 12 of the Federal Rules of Civil

Procedure to dismiss the underlying complaint.  KBR moves the Court to dismiss the case as

non-justiciable under the political question doctrine, *Baker v. Carr*, 369 U.S. 186 (1962), as well

as preempted by the federal law interpreting the "combatant activities" exception to the Federal

Tort Claims Act ("FTCA"), 28 U.S.C. 2680(j); *see Koohi v. United States*, 976 F.3d 1328 (9th

Cir. 1992); *Bentzlin v. Hughes Aircraft*, 833 F. Supp. 1486 (C.D. Cal. 1993).

**I.    INTRODUCTION**

Plaintiffs seek to recover damages for the death of Private First Class Marquis A.

Whitaker ("PFC Whitaker"), who served in the United States Army in Iraq and who was killed

on April 27, 2004, while escorting a military supply convoy from Al Kut to the U.S. military's

Convoy Support Center in Scania, Iraq. The Court should dismiss the claims raised by Plaintiffs for two reasons. First, under the political question doctrine, courts lack jurisdiction over "political" questions, particularly those involving military decision-making in combat scenarios. If the Court permits Plaintiffs' action to proceed, it ultimately will have to substitute its judgment for that of the U.S. military, including PFC Whitaker, relating to strategic and tactical decisions made in a combat zone. It is just such a scenario that the political question doctrine is intended to prevent. As the Supreme Court has made clear: "Trained professionals, subject to the day-to-day control of the responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution. It would be inappropriate for a district judge to undertake this responsibility in the unlikely event that he possessed requisite technical competence to do so." *Gilligan v. Morgan*, 413 U.S. 1, 8 (1973).

Second, the FTCA's combatant activities exception, which shields the U.S. government from tort liability arising out of military activities during time of war, also has been interpreted to protect the military's defense contractors, like KBR, which provide essential services to the armed forces of the United States. In *Koohi*, the Ninth Circuit concluded that this exception served to preempt state tort causes of action brought by foreign civilians against a defense contractor. In *Bentzlin*, this principle was applied to preempt state tort causes of action brought by U.S. military personnel against a defense contractor, just as claims of negligence have been made against KBR in this case. Given that Plaintiffs' Complaint in this case inevitably requires this Court to second-guess and substitute its judgment for the U.S. military's decision-making in

the conduct of the war in Iraq, both the combatant activities exception and the political question doctrine apply and each provides an independent basis for dismissal.[1]

More specifically, if it permits this action to proceed, the Court will be asked to substitute its judgment for that of the military in at least the following areas:

- Whether the military's procedures, or lack thereof, for accompanying supply convoys in a combat zone were adequate and reasonable under the exigent circumstances, i.e., the threat of insurgent attacks, of April 27, 2004, the date of this incident?

- Whether the military's policies regarding convoys were adequate and reasonable and properly balanced the risks of attack and the need to satisfy military supply requirements with the risks of driving vehicles in close proximity at designated speeds?

- Whether the military's training of its military escorts, was sufficient to allow such escorts safely to accompany convoy vehicles used in a combat zone in Iraq?

- Whether the instructions, or lack thereof, given to military escorts on April 27, 2004, regarding the road conditions, convoy speed, and convoy configuration were adequate to address the convoy incident in question?

---

[1] In addition to these grounds, KBR expressly reserves the right to assert other bases for dismissal should the Court decline to dismiss this suit for the reasons asserted herein. Particularly, any further prosecution or defense of this case may trigger the protections of the state secrets privilege because classified information may have been implicated regarding the supply needs of the United States military, its procedures for intelligence gathering and threat assessment, and its rules and protocols regarding force protection provided to civilian contractors. *See United States v. Reynolds*, 345 U.S. 1 (1953); *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991).

- Whether military needs and tactical concerns justified the military's decision to retain the Iraqi drivers, notwithstanding the requests from the military escorts that the drivers be replaced because of their inexperience and questionable driving skills?

- Whether the instructions and training given to PFC Whitaker by the military regarding the use of body armor were adequate and reasonable under the circumstances in existence as of April 27, 2004?

- Whether the instructions and training provided to U.S. military personnel in Iraq regarding life-saving techniques were adequate and reasonable under the circumstances in existence as of April 27, 2004?

- Whether PFC Whitaker's decisions on April 27, 2004, regarding the wearing of body armor; the setting of his vehicle's speed; the setting of the distance between his vehicle and the convoy supply trucks; and stopping suddenly on a bridge, knowing that other convoy vehicles were close behind, were reasonable under the combat situation he faced?

- Whether the conduct of the other individuals involved in this incident, both military and civilian, was reasonable, given their presence in a combat zone?

- Whether KBR's actions regarding the selection and training of foreign convoy drivers were reasonable in light of the control exercised by the U.S. military over that process?

No judicially cognizable standards exist for the Court to make such determinations. To do so would require the Court to opine as to matters committed to the political branches of the United States government as well as to impose United States tort standards upon essentially military operations. This result is particularly inappropriate in this circumstance, because the U.S. military already has conducted an investigation and determined what corrective actions

should be taken.  For these reasons, the Court should dismiss the case pursuant to the political question doctrine and combatant activity exception.

## II.    BACKGROUND

This litigation was commenced on July 21, 2005, when Plaintiffs filed a Complaint seeking to recover for the death of PFC Whitaker.  The Complaint alleges that PFC Whitaker served in the 2nd Armored Calvary Regiment of the United States Army.  Complaint, ¶ 8.  PFC Whitaker was a member of the military escort assigned to provide security for supply convoys transporting cargo within Iraq.  *Id.*[2]

### A.    The Incident Resulting in PFC Whitaker's Death Took Place in a Combat Zone in Iraq

On April 27, 2004, PFC Whitaker was the driver of an armed escort vehicle in a convoy en route to the Convoy Support Center located at Scania, Iraq.  The convoy trucks were being driven by individuals allegedly employed and controlled by KBR.  As the convoy passed over a bridge, the convoy truck in front of PFC Whitaker's vehicle hit the bridge guardrail and drove over the side of the bridge.  *Id.*, ¶ 15.  PFC Whitaker stopped his escort vehicle on the bridge, but his vehicle was struck by the convoy truck following behind him.  *Id.*, ¶ 16.

The impact pushed PFC Whitaker's vehicle close to the edge of the bridge.  While attempting to exit the vehicle, PFC Whitaker fell over the bridge into the water below.  Other soldiers attempted unsuccessfully to rescue PFC Whitaker, but they unfortunately were unable to retrieve him from the water.  Given the combat environment, the military escort secured the

---

[2] A substantial question exists whether KBR actually was responsible for the convoy in question.  However, solely for purposes of this motion to dismiss, and reserving its rights to move to dismiss if it is later determined that KBR was not responsible for the convoy in question, KBR assumes that the convoy was operated by KBR personnel under U.S. military supervision and direction.

perimeter around the accident site against potential insurgent attacks and conducted a search for PFC Whitaker. His body was recovered a short distance downstream the next day.

The Complaint claims that KBR is liable under the doctrine of *respondeat superior* for the negligent conduct of the convoy truck drivers allegedly working under KBR's direction. The Complaint also alleges that KBR was negligent in selecting, training, and supervising the truck drivers. *Id.*, ¶ 20.

### B.    The U.S. Military Uses Civilian Contractors Like KBR to Provide Essential Support Services in Iraq Under the Protection of Military Personnel

In 1985, the United States Army issued regulations that authorized the use of civilian contractors to provide selected services in wartime to augment Army forces. *See* "Logistics Civil Augmentation Program (LOGCAP)," Army Regulation 700-137 (16 December 1985) ("A.R. 700-137") (attached hereto as Exhibit A), at 1-1. The use of civilian contractors frees up military units to perform other duties. *Id.* The major Army commands are required to evaluate logistical support functions and find an appropriate balance between the use of military personnel and civilian contractors. *Id.* at 2-4. "Risk assessment to both the overall mission and to the safety of contractor personnel must be considered." *Id.* at 3-1.

Although LOGCAP contractors use civilian personnel, they nonetheless are expected to work closely with military personnel. Contractor personnel are never placed in a position of command or control over military personnel. A.R. 700-137 at 3-2(d)(3). However, it is expected that "the Army will fight as a total force--active and reserve components and civilians." "Army Motor Transport Units and Operations," Army Field Manual 55-30 (15 September 1999) ("F.M. 55-30") (of which relevant parts are attached hereto as Exhibit B), at 1-1. "Contractor employees are not under the direct supervision of military personnel in the chain of command"; however, they are "expected to adhere to all guidance and obey all instructions and general

6

orders issued by the Theater Commander." "Contractors Accompanying the Force," Army Regulation 715-9, at 14 (attached hereto as Exhibit C).

Motor transport units are expected to support all inland surface movement requirements and integrate LOGCAP and other contract support. F.M. 55-30, at 1-1. "LOGCAP is used when contractor support is determined to be the most effective, expeditious, or cost effective" means of providing transport assistance. *Id.* at 1-11. All aspects of the control, organization, and planning of convoy operations such as the one in question here are regulated by relevant Army regulations and directives. *See id.* at Chapter 5--"Convoy Control, Organization, and Planning."

These regulations mandate that convoy escorts and security elements that protect the convoy from enemy activity are the responsibility of the military. *Id.* at 5-4(i). Army regulations require that standard operating procedures ("SOPs") be created that encompass the duties of the convoy commander and other convoy control personnel, convoy organization, preparation of convoy vehicles, operations security measures, and the maintenance and recovery of disabled vehicles. *Id.* at 5-5. Further, Army regulations specifically address convoy defense techniques (*Id.*, Chapter 6) and preventative maintenance requirements (*Id.*, Chapter 9).

C.    **The Army's Accident Investigation Reveals a Number of Factors That Could Have Played a Role in PFC Whitaker's Death**

As noted in Plaintiffs' Complaint, KBR provides combat and combat service support for the U.S. Army in Iraq. Given that these supply operations often occur in areas that have been secured by the U.S. military but nonetheless always have the potential for sudden attacks by hostile forces, the U.S. military provides force protection to contractor employees. The escort team of which PFC Whitaker was a member was part of that force protection.

The U.S. Army conducted an official accident investigation following PFC Whitaker's death. A copy of the "Presentation of Collateral Investigation of Private First Class Marquis A.

Whitaker" ("Investigation Presentation"), as well as related witness statements from the accident investigation, were provided by Plaintiffs' counsel to KBR's counsel and are attached hereto as Exhibit D.[3]  The report reflects the role of the military and the exercise of its discretion in the events leading to and following the accident.

The Investigation Presentation indicates that the eight-vehicle convoy was made up of four military convoy supply trucks and four military escort vehicles.  PFC Whitaker was the driver of the third escort vehicle, which was the fifth vehicle in the convoy.  Ex. D, at 9.  The Presentation indicates that the speed of the convoy was set between 35 and 40 miles per hour and that the interval between vehicles was supposed to be 25 meters.  *Id.*  The convoy was operating in a "staggered" formation, with the gun truck escorts to the left of the convoy trucks.  *Id.* at 37.

All of the military witnesses say that they observed, prior to the convoy's departure that morning, that one of the foreign nationals who was serving as a convoy truck driver was having difficulty handling his vehicle.  They were told that the individual had not previously driven a convoy supply truck.  *Id.* at 39, 44, 50, 54.  One of the military escorts asked the commander of

---

[3] KBR is NOT relying on or asserting the truth or correctness of the information or conclusions of these materials.  Instead, as explained below, the materials merely confirm the existence of the non-justiciable political questions the Court will be called to resolve if it chooses to exercise its jurisdiction over the matter and allows the case to proceed.  To that extent, the report supports KBR's argument that the Court should decline to exercise its jurisdiction in this case.  *See, e.g.*, *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (court may look to matters outside the pleadings when resolving questions of jurisdiction); *Dickson v. Ford*, 521 F.2d 234, 235 (5th Cir. 1975) (affirming the dismissal of an action because the case "clearly present[ed] a nonjusticiable political question beyond the jurisdictional limitations imposed upon federal courts by Art. III of the Constitution"); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1201 (5th Cir. 1978) (dismissing action for lack of jurisdiction because it raised a political question, not a "case or controversy" within the scope of Article III).  *Cf. Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (Fifth Circuit decisions issued prior to establishment of Eleventh Circuit in 1981 are binding precedent upon Eleventh Circuit).

the convoy if he could drive the convoy supply truck instead of the foreign national, but that request was denied. *Id.* at 39.

As the convoy approached the bridge, the vehicles still were in a "staggered" formation, but the interval between the vehicles was minimal. Indeed, PFC Whitaker's gun truck apparently was so close to the convoy supply truck in front of it that "at least part of the hood [of the gun truck] was next to the trailer in front of [PFC Whitaker's vehicle]." *Id.* at 37. When the convoy supply truck in front of PFC Whitaker's vehicle went off the bridge, PFC Whitaker executed an evasive maneuver and tried to stop the gun truck on the bridge near where the convoy truck was lost. However, the convoy supply truck that was following PFC Whitaker's gun truck was unable to stop in time and struck the gun truck, pushing it close to the edge of the bridge.

As PFC Whitaker attempted to exit his vehicle, he fell from the bridge into the water below. Other soldiers attempted to rescue him, but PFC Whitaker panicked and broke free from his rescuers. Weighed down by the body armor he was wearing, PFC Whitaker was unable to stay afloat and subsequently drowned. *Id.* at 20, 45. The military search teams found his body the next day, a short distance downstream.

The military official investigating the accident recommended that the military "re-emphasize" to its personnel three important safety measures. First, U.S. military commanders have the absolute right to reject foreign drivers from convoy operations. Second, personnel must adhere to those regulations and procedures that set forth the proper placement of escort vehicles in a convoy. Third, the military has measures in place to monitor and deal with non-US drivers. *Id.* at 33.

## III.  ARGUMENT

### A.  The Court Should Dismiss the Claims of the Plaintiffs Because They Raise Non-Justiciable Political Questions

As demonstrated below, the political question doctrine applies to this case and the Court should dismiss the Complaint on jurisdictional grounds.  Plaintiffs' Complaint necessarily raises issues that are committed to the discretion of the political branches of government.  Indeed, the Executive Branch, in this case the United States military, already has performed these appropriate responsibilities by investigating this incident and concluding that safety measures and training should be re-emphasized to convoy escorts.  Further, no judicially manageable standards exist to evaluate the propriety of the decisions at issue here:  whether the military properly declined to replace the driver despite the request of the military escort; whether the convoy was traveling at an appropriate speed and with proper intervals between vehicles; whether PFC Whitaker acted properly when he tried to stop on the bridge; whether his injury was attributable in whole or in part to the military's failure to train him or other members of the escort on proper convoy and lifesaving procedures; and whether KBR acted reasonably as a government contractor bound by its obligations under U.S. military regulations.

Article III of the United States Constitution limits judicial power to "cases" and "controversies."  Courts lack the constitutional jurisdiction or competence to decide political issues or questions because they do not present cases or controversies within the meaning of Article III of the Constitution.  *Occidental of UMM al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F. 2d 1196, 1203 (5th Cir. 1978); *Eveland v. Director of Central Intelligence Agency*, 843 F.2d 46, 49 (1st Cir. 1988).  The political question doctrine recognizes both the constitutional separation of powers among the branches of the federal government, as well as the inherent limitations of the judiciary.  *Occidental*, 577 F.2d at 1203.

"Whether an issue presents a non-justiciable political question cannot be determined by a precise formula." *Saldano v. O'Connell*, 322 F.3d 365, 367 (5th Cir. 2003). In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court set forth six independent tests for the existence of a political question outside the proper scope of review of the federal judiciary:

> Prominent on the surface of any case held to involve a political question is found
>
> (1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
>
> (2)    a lack of judicially discoverable and manageable standards for resolving it; or
>
> (3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
>
> (4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or
>
> (5)    an unusual need for unquestioning adherence to a political decision already made; or
>
> (6)    the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see also State of New Jersey*, 91 F.3d at 469 (relying on *Baker* factors to apply doctrine). These six independent "tests are probably listed in descending order of both importance and certainty." *Vieth v. Jubelier*, 541 U.S. 267, 278 (2004).

The political question doctrine has been applied in the past by numerous courts to damage claims brought by military or civilian personnel against defense contractors for wrongful death and personal injuries allegedly resulting from negligently designed and maintained equipment used in combat-related scenarios. *See, e.g., Nejad v. United States*, 724 F. Supp. 753 (C.D. Cal. 1989) (wrongful death action brought by families of Iranian civilians killed in shoot down of Airbus by U.S.S. Vincennes in Persian Gulf dismissed against military contractors

under political question doctrine); *Bentzlin v. Hughes Aircraft*, 833 F. Supp. 1486 (C.D. Cal. 1993) (wrongful death action brought by families of military personnel killed in "friendly fire" accident during Operation Desert Storm dismissed against defense contractor under political question doctrine); *Zuckerbraun v. General Dynamics Corp.*, 755 F. Supp. 1134 (D. Conn. 1990) (wrongful death action on behalf of Navy sailors killed from Iraqi attack on U.S.S. Stark dismissed against military contractors under political question doctrine), *aff'd on other grounds*, 935 F.2d 544 (2d Cir. 1991). These past decisions recognized that several of the *Baker* factors can be implicated in personal injury lawsuits arising from military incidents, and that conclusion applies to the instant case as well.

    1.    <u>The Issues Raised by Plaintiffs' Complaint Are Constitutionally Committed to the Political Branches</u>

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Military decision-making is one such area. As the Supreme Court explained in *Baker*, questions touching on national security and foreign affairs often implicate the political question doctrine, as they "frequently turn on standards that defy judicial applications or involve the exercise of a discretion demonstrably committed to the executive or legislature . . . ." *Baker*, 369 U.S. at 211.

The conduct of military operations, particularly in a combat scenario, raises non-judiciable political questions constitutionally committed to the political branches. Article II, § 2, of the U.S. Constitution grants to the President authority over the conduct of foreign affairs and over the armed forces to protect the national security of the United States as Commander-In-Chief. *See also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-20 (1936).

Article I, § 8, grants to Congress authority to raise and support Armies, to provide and maintain a Navy, and to make rules for the government and regulation of the land and Naval forces. *See also Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (rebuffing plaintiffs' efforts to categorize suit challenging adequacy of military training as "common negligence action" and affirming dismissal on political question grounds); *Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975) (a challenge to foreign military sales involved a political question); *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736 (S.D.N.Y. 1986) (plaintiff's claim for damages caused to vessel when it allegedly hit a CIA mine planted in Nicaraguan harbor is a non-judiciable political question), *aff'd*, 819 F.2d 1129 (2d 1987); *In re Korean Airlines Disaster*, 597 F. Supp. 613 (D.D.C. 1984) (whether military had a duty to warn airliner of proximity to Soviet Union presented a political question).

The reasoning of these judicial decisions squarely applies in this case. Plaintiffs challenge the conduct of a defense contractor employed by the United States to provide logistical support to the United States military in the ongoing conflict in Iraq. The allegations necessarily call into question the conduct of the military and its handling of its supply convoys used to support ongoing military operations. For example, the conduct of PFC Whitaker -- driving in close proximity to the convoy trucks in front of and behind his escort vehicle; attempting to stop on the bridge, rather than driving to a point of safety on the other side; and wearing and/or failing to remove his body armor -- likely played a role in his death. Thus, whether PFC Whitaker was trained properly in convoy control; whether he complied with applicable military regulations and directives regarding convoy operation; and whether those regulations were adequate to prevent his death are all relevant inquiries.

13

But, these decisions squarely are reserved to the political branches. "It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches . . . . The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system . . . ." *Gilligan*, 413 U.S. at 10.

Further, it is clear that the Executive Branch has exercised its oversight and control in this very matter. After conducting a thorough investigation into the various causes of the accident, the U.S. military issued several recommendations. These recommendations related to the remedial training of military personnel regarding the use and supervision of foreign nationals as convoy drivers as well as the proper spacing of escort vehicles within a convoy. It would be inappropriate for the Court now to second-guess the military's decisions and substitute its judgment regarding the proper response to a military accident occurring in a combat zone.

In brief, the level of protection provided by the United States to military supply convoys necessarily is left to the discretion of the military. The assessment of potential threats, the appropriate response level to such threats, the value placed on particular convoys based upon military needs, and the conduct of military personnel while providing such force protection rests squarely with the political branches of government, not the courts or private contractors such as KBR. As such, dismissal under this prong of the *Baker* test is compelling in the instant case.

2.    The Issues Raised in Plaintiffs' Complaint Are Not Susceptible of Resolution by Judicially Discoverable Standards

The issues in this case also run afoul of *Baker* because no judicially manageable standards exist for their resolution. Indeed, "it is difficult to conceive of an area of governmental

activity in which the courts have less competence.  The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . ."  *Gilligan*, 413 U.S. at 10.

The decision of the United States to use private contractors as support personnel in foreign lands, under the threat of hostile action, necessarily involves a consideration of security issues, military strategy, and political implications, both foreign and domestic.  Adjudication of the questions raised in this case effectively would require the Court to make policy decisions in the realm of national security and military affairs without knowledge or expertise regarding the formulation, implementation, and ramifications of those policies.  *See Baker*, 369 U.S. at 211, 217.  *See also Rappenecker v. United States*, 509 F. Supp. 1024, 1030 (N.D. Cal. 1980) ("[C]ourts lack standards with which to judge whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life.").

If this case is not dismissed, the Court will be required to evaluate the conduct of the military, PFC Whitaker, and KBR without having any standards with which to do so.  With respect to the military, the Court will have to determine whether the military exercised reasonable judgment in refusing to replace the civilian drivers whose conduct is at issue, despite the requests of the escort personnel.  It will have to consider whether the risk of insurgent attack made it reasonable for the military to require members of the military escort to wear body armor; whether it was reasonable for the military to require the convoy to maintain a particular speed with particular vehicle intervals in the face of potential insurgent attacks; and whether the military properly trained soldiers in Iraq how to prevent potential drownings.

The Court also will have to consider the conduct of PFC Whitaker and decide whether the speed and intervals he set were reasonable and consistent with military needs.  It also will

have to decide if it was appropriate for PFC Whitaker to attempt to stop on the bridge rather than continue to the other side before stopping. No judicially cognizable standards exist for such an evaluation.

The Court lacks such standards even with respect to evaluating KBR's conduct. The decisions made by KBR with respect to the selection and training of convoy drivers necessarily are bound by the standards and regulations set by the U.S. military which, as explained above, govern every facet of KBR's participation in the war effort. Whether KBR acted reasonably on the battlefield in light of those regulations, requirements, and needs cannot be second-guessed in the quiet of judicial chambers or the calm reflection of the jury room.

In short, these determinations necessarily depend upon the analysis of military needs and priorities, which will present the Court with a host of issues for which it is simply not equipped to discern or apply appropriate standards. "Decisions relative to training result from a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness. . . . Courts will often be without knowledge of the facts or standards necessary to assess the wisdom of the balance struck." *Aktepe*, 105 F.3d at 1404.

> 3.    The Issues Raised By This Case Are Impossible to Decide Without an Initial Policy Determination of a Kind Clearly for Nonjudicial Discretion, or Without Expressing a Lack of Respect Due to the Coordinate Branches of Government

Several other factors set forth in *Baker* also apply in this case. The needs of the military, the training afforded military personnel, and the standards of interaction between military personnel and civilian contractors in a combat zone certainly require initial policy decisions clearly committed to the discretion of the political branches. The judiciary is neither in a position to make nor review such policy decisions. In fact, as noted, the Executive Branch, through the military's investigation of this incident, already has exercised the appropriate review.

Further, a judicial decision calling into question the military policy of the United States regarding its ongoing military efforts in Iraq would express a lack of respect due to the coordinate branches of government that oversee those war efforts. *In re Korean Air Lines Disaster*, 597 F. Supp. at 616 ("[D]ecisions which affect the national security . . . involve policy considerations beyond the scope of judicial expertise" and would "certainly evince a lack of respect due coordinate branches of government" (citations omitted)).

In short, Plaintiffs' claims against KBR cannot be separated from the military decisions of the United States government. This case implicates many of the factors set forth in *Baker,* any one of which is sufficient to render the matter non-justiciable.

**B.      The Court Should Dismiss Plaintiffs' Complaint Because the Incident Arose As Part of Combatant Activities During Time of War**

An additional, independent basis for dismissal of this case exists. The state law claims asserted by Plaintiffs are preempted by federal law -- specifically, the combatant activities exception contained within the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(j). The FTCA, 28 U.S.C. §§ 2671-2680, together with 28 U.S.C. § 1346, creates a cause of action against, and constitutes a waiver of sovereign immunity by, the United States for actions in tort. The FTCA contains a number of exceptions to this general rule, including § 2680(j), which excludes "any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."

This exception to the FTCA's waiver of sovereign immunity does not apply directly to government contractors. However, the principles underlying the exception have been extended to defense contractors. *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992); *Bentzlin v. Hughes Aircraft*, 833 F. Supp. 1486 (C.D. Cal. 1993). In *Koohi*, the Ninth Circuit relied on the FTCA's combatant activities exception to bar state law claims against a weapons manufacturer

for injuries sustained during the Iran-Iraq "tanker war" of the 1980s. The plaintiffs in *Koohi* sought compensation from the United States and from private weapons manufacturers after a U.S. naval cruiser, the U.S.S. Vincennes, mistook a civilian aircraft for a military flight and shot it down. 976 F.2d at 1330. The court held that the United States had not waived its sovereign immunity because of the FTCA's combatant activities exception.

The court held further that the same exception preempted the plaintiffs' claims against the private contractors who designed and manufactured the weapon systems that were used to shoot down the civilian aircraft.[4] *Id.* at 1336-37. While recognizing that private parties cannot assert a sovereign immunity defense, the *Koohi* court noted that "the Supreme Court has recognized that the exceptions to the FTCA may preempt common law tort actions against defense contractors under certain circumstances." *Id.* at 1336. The *Koohi* court found that the combatant activities exception is one such instance of preemption.

The *Bentzlin* court adopted the reasoning of *Koohi* and applied it to circumstances involving U.S. military personnel. In *Bentzlin*, a group of U.S. Marines were killed during Operation Desert Storm when a missile intended for an Iraqi target hit the Marines' truck instead. The families of the Marines brought suit against the manufacturer of the missile, asserting that it "negligently and carelessly manufactured, tested, inspected, stored, transported, distributed and controlled" the missile. 833 F. Supp. at 1487. Thus, the case centered around defective product *and* defective service allegations. Relying on *Koohi*, the court dismissed the case. *Id.* at 1494.

---

[4] The court recognized that "time of war" does not require a formal declaration from Congress. Instead, the FTCA exception applies whenever the Executive Branch makes a deliberate decision to engage United States armed forces "in an organized series of hostile encounters on a significant scale with the military forces of another nation." *Id.* at 1335.

Both the *Koohi* and *Bentzlin* decisions found that the three principles of tort law -- deterrence, punishment, and remedy to innocent victims -- are inconsistent with the conduct that occurs in combat zones. First, in times of war, caution must often give way to "bold and imaginative measures" needed to achieve victory. Concerns about tort liability cannot be permitted to deter participants from taking fast action in combat situations. 976 F.2d at 1335. Second, the government, as well as the government contractors that support the government, should not be punished for mistakes made during war. *Id.*; *see also Bentzlin*, 833 F. Supp. at 1493 (military is in the best position to sanction non-performing government contractors). Third, there is a federal interest in seeing that casualties of war, no matter how sustained and by whom, are subject to uniform treatment. *Id.* As the court in *Bentzlin* recognized when it applied the holding of *Koohi* to injuries sustained by U.S. military forces, "[d]eaths and injuries of soldiers in war arise from a plethora of circumstances, many of which may be judged to involve some degree of fault. Unsuccessful military strategy, unwise orders by individual officers and mistakes by fellow soldiers all lead to the loss of life, and these causes clearly do not give rise to civil liability. . . . In a wartime context, state law cannot establish the duty of care owed to American soldiers who necessarily assume the risk of death." 833 F. Supp. at 1494.[5]

---

[5] In a recent decision, the Honorable Nancy F. Atlas, United States District Judge for the Southern District of Texas, declined to apply the combatant activities exception to a tort case brought against KBR by a civilian convoy driver for injuries sustained in Iraq from an insurgent attack. *Fisher v. Halliburton*, C.A. No. H-05-1731, July 1, 2005 (attached hereto as Exhibit E). Judge Atlas incorrectly distinguished the *Koohi* and *Bentzlin* cases as dealing with allegedly defective products provided to the government, rather than services provided to the government. In fact, *Koohi* and *Bentzlin*, like the instant case, included allegations of negligent services, e.g., inspection and testing, against the military contractors in those cases. Further, there is nothing in the reasoning of the *Koohi* and *Bentzlin* decisions that limits their effect to product cases. Whether a civil case involves products or services, "civilian state law standards cannot be applied to those who suffer the tragedies contemplated in war." *Bentzlin*, 833 F. Supp. at 1494.

In the instant case, just as in *Bentzlin*, a negligence suit has been brought against a military contractor for injuries sustained by U.S. military personnel engaged in combatant activities. The ongoing hostilities in Iraq certainly are of sufficient magnitude to constitute a time of war within the meaning of the FTCA. Thus, this Court should follow the reasoning in *Bentzlin* and *Koohi*.

The convoy duties performed by KBR are an integral part of the ongoing military activities of the United States in the hostile territory of Iraq. KBR stands together with the military in the operations in Iraq, and imposing liability on it would serve to create duties that potentially could cause contractors supporting the military in time of war to fail in their role to support the military effort. It would be an unwise policy indeed that caused government contractors in combat zones to resist or second-guess the actions and orders of their military escorts for fear of potential tort liability. Further, such liability concerns might cause contractors to refrain from participating in any military support contracts whatsoever, leaving the military without the support it needs to fulfill its combat missions. The combatant activities exception precludes imposing liability that could have such an effect on the conduct of war by the Executive Branch.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant KBR respectfully requests that Plaintiffs' Original Complaint be dismissed with prejudice.

Respectfully submitted, this 19th day of October, 2005.

MCKENNA LONG & ALDRIDGE LLP


/s/ Jonathan R. Friedman
Jonathan R. Friedman
Georgia Bar No. 277720
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
jfriedman@mckennalong.com

OF COUNSEL:

Raymond B. Biagini
Kurt J. Hamrock
Lisa M. Norrett
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7500

*Attorneys for Defendant*
*Kellogg Brown & Root, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2005, I electronically filed this Defendant Kellogg Brown & Root, Inc.'s Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(B) with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorney of record:

C. Frederick Overby, Esq.
Overby Law Office, P.C.
P.O. Box 1975
Columbus, Georgia 31902


/s/  Jonathan R. Friedman
Jonathan R. Friedman